UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | | |
|---|---|---|
| SEANTOYA HINTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | |
| SONNY PERDUE, SECRETARY OF | ) | Civil Action No.: 5:20-cv-00062 |
| AGRICULTURE, UNITED STATES | ) | Jury Trial Demanded |
| DEPARTMENT OF AGRICULTURE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

NOW COMES PLAINTIFF, SEANTOYA HINTON, by and through undersigned counsel, and complains against Defendant SONNY PERDUE, SECRETARY OF AGRICULTURE FOR THE UNITED STATES DEPARTMENT OF AGRICULTURE as follows:

## INTRODUCTION AND NATURE OF THE CASE

Plaintiff brings this action against Defendant for its violations of the Rehabilitation Act of 1973, at 29 U.S.C. §§ 791, *et seq*., (the "Rehabilitation Act" or the "Act") for 1) failing to provide her reasonable accommodations; 2) retaliating against her; and 3) creating a hostile work environment. Plaintiff seeks declaratory relief, injunctive relief, monetary damages and relief pursuant to 29 U.S.C. § 794a(a)(1), 42 U.S.C. § 2000(e)-5(f)-(k) and 42 U.S.C. § 1981a or otherwise permitted by law.

## JURISDICTION AND VENUE

1. This Court has original subject matter jurisdiction over this action pursuant 28 U.S.C. § 1331, as the claim for relief asserted herein arises under federal law.

2.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1)(B) because Defendant is an agency of the United States government and a substantial part of the events or omissions giving rise to the claims occurred in this District.

**PARTIES**

3.      Plaintiff Seantoya Hinton ("Ms. Hinton") is a citizen and resident of Wake County, North Carolina.  At all relevant times, Ms. Hinton was employed by the United States Department of Agriculture ("USDA" or the "Agency") as the Office Manager of the Plant Protection and Quarantine division ("PPQ") of the Animal and Plant Health Inspection Service ("APHIS") unit located in Raleigh, North Carolina.

4.      Defendant Sonny Perdue currently serves as the Secretary of Agriculture for the USDA, an executive agency or instrumentality of the federal government, subject to the laws of the United States of America, including the Rehabilitation Act. Perdue is named as sole defendant for the actions or inactions of the Agency and its employees as required by 29 U.S.C. § 794a(a)(1), 5 U.S.C. § 7702 and 42 U.S.C. § 2000(e)-16(c).

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

5.      Ms. Hinton requested numerous reasonable accommodations as detailed *infra*, all of which were denied. Ms. Hinton was subjected to harassment and a hostile work environment caused by her supervisor, Joseph Beckwith because of her status as a disabled person.

6.      Ms. Hinton contacted the Agency's Equal Employment Office ("EEO") counselor and made an informal complaint on March 14, 2019.

7.      Ms. Hinton received a Notice of Right to File on April 12, 2019, and she filed her formal EEO complaint on May 3, 2019.

8.      The Agency issued a Letter of Acceptance of her EEO complaint on May 28, 2019.

9. On June 11, 2019, Ms. Hinton requested to amend her EEO complaint to include claims of retaliation based on Defendant's actions against her during the EEO process.

10. The Agency accepted Ms. Hinton's amended EEO complaint on August 1, 2019 and designated the amended complaint as a "mixed case complaint" pursuant to 29 C.F.R. § 1614.302.

11. Ms. Hinton complied with all deadlines relating to the investigation of her formal administrative complaint.

12. The Agency provided Ms. Hinton with its Report of Investigation on October 11, 2019.

13. Pursuant to 29 C.F.R. § 1614.3029(d)(2), the Agency issued its Final Agency Decision ("FAD") to Ms. Hinton on January 10, 2020. Ms. Hinton received the FAD on January 21, 2020. See Exhibit 1.

14. Pursuant to 5 U.S.C. § 7702 and 29 C.F.R. § 1614.310(a), Ms. Hinton may, within thirty (30) days of receipt of the FAD, file a civil action in the appropriate United States District Court.

15. Having complied with all relevant provisions of Title 29 of the Code of Federal Regulations, Ms. Hinton, as of right, has elected to file this civil action within the time prescribed *supra*, without engaging in further administrative procedures.

## FACTUAL ALLEGATIONS

### I. Background and Disability:

16. Ms. Hinton honorably served as a member of the United States Army from July 2001 to February 2010 as a Human Resources Supervisor. During her 2003 tour of duty in Iraq, Ms. Hinton was injured when an IED exploded as the vehicle she was traveling in drove over it.

Ms. Hinton fractured both of her feet in the explosion, requiring multiple surgeries including bilateral feet reconstruction and ligament lengthening.

17.     In 2007, Ms. Hinton was placed into the Warrior Transition Unit in Texas. Placement in this unit allows service members to receive treatment for their injuries and continue working jobs based on their level of ability.

18.     In January 2009, Ms. Hinton returned to North Carolina to continue her transition into medical retirement.

19.     On February 18, 2010, the Army's Medical Evaluation Board determined that, because of the permanent injury to her feet and her inability to pass the PEB Physical Evaluation, Ms. Hinton was no longer able to fulfil her duties as a Human Resource Supervisor, and therefore she was medically retired from service. Ms. Hinton had metal plates and screws in both of her feet which caused balance and mobility issues. She also suffers from degenerative arthritis which causes pain and swelling in her feet.

20.     In 2013, Ms. Hinton began to experience anxiety and other PTSD-related symptoms. She sought treatment at the Department of Veterans Affairs (the "VA"). Per VA protocol, Ms. Hinton was placed into a short-term therapy program.

21.     In 2015, Ms. Hinton was diagnosed with Generalized Anxiety Disorder and Major Depressive Disorder by her treating psychiatrist, Heg Nataraja, MD.

22.     On November 4, 2015, Robbie Biddix, a clinical social worker with the VA, provided Ms. Hinton with a letter stating she would benefit from the use of a service dog. He indicated that Ms. Hinton received treatment for depression, anxiety and PTSD-symptoms and that a service dog would help to elevate her mood and help her feel more connected to others.

4

23.     Ms. Hinton completed a wait-list application for a service dog through Guardian Angels Medical Service Dogs, Inc. in December 2015. In support of her application, Dr. Nataraja provided a letter stating that Ms. Hinton may benefit from a service dog to help reduce anxiety and depressive symptoms, particularly in public.

24.     Because Ms. Hinton's PTSD symptoms persisted, she was placed into a long-term therapy program. On January 15, 2016, Dr. Nataraja diagnosed Ms. Hinton with Post-Traumatic Stress Disorder.

25.     On April 5, 2017, Eric Kirchmann, MD, Ms. Hinton's new psychiatrist, provided a letter certifying that she is an individual with severe physical, intellectual or psychiatric disability that qualified her for consideration under 5 C.F.R § 213.3102(u).

26.     Ms. Hinton received RJ, an approved service canine in November 2017. RJ completed a service dog training course in which he was certified to assist Ms. Hinton with balance, walking, shielding and the effects of PTSD.  RJ was trained to obey all verbal commands from Ms. Hinton. He also completed Canine Good Citizen training and passed the public access test.

## II.     <u>USDA Employment</u>

27.     Ms. Hinton was hired by the USDA as an Office Manager ("OM") PPQ, APHIS, GS-0303-07, on February 23, 2014.[1]  From February 2014 through January 2016, Ms. Hinton was the OM over all State Plant Health offices in North Carolina and South Carolina. She worked in the Raleigh PPQ APHIS office and served all South Carolina locations remotely.[2] Ms. Hinton's current first-line supervisor is Joseph Beckwith, the North Carolina State Plant Health Director.

---

[1] Prior to her employment with the USDA, Ms. Hinton worked at the United States Department of Justice as a Medical Support Assistant at the Federal Medical Center in Butner, North Carolina from October 2010 through February 2014.
[2] In 2016, the South Carolina office was assigned its own OM.

5

He has held this position in a temporary capacity since late-2016 and was hired permanently in November 2017.

28.     As OM, Ms. Hinton is responsible for the coordination of overall administrative, organizational and management processes for PPQ APHIS offices throughout North Carolina. Areas of Ms. Hinton's oversight include, but are not limited to, budget/fiscal; grants; interagency agreements and MOUs; procurement; purchasing; time and attendance; training and orientation; file management; and management of reports.

29.     In January 2016, Ms. Hinton was approved to work a Maxiflex schedule. A Maxiflex schedule requires full time employees (like Ms. Hinton) to work 80 hours per pay period. Supervisors define an employee's "glide times" (flexible start/stop work hours), and the employee may choose the hours worked within the flexible glide times as long as the employee works 80 hours per pay period. Ms. Hinton's approved "glide hours" are 6:00AM to 6:00PM. Ms. Hinton was approved to work the Maxiflex schedule to accommodate her medical appointments and her PTSD symptoms, which included the flexibility to leave the office when she began to experience PTSD-related symptoms or experienced a panic attack.

30.     On August 16, 2016, Ms. Hinton requested to telework from home to alleviate the stress and anxiety she felt while working in the office setting until she received further guidance on receipt of a service animal. Ms. Hinton indicated that while working from home she would be able to complete the essential functions of her job. She completed telework training on August 30, 2016 and was granted the ability to telework from home on an as needed basis. Ms. Hinton's then supervisor, Deborah Stewart, approved this reasonable accommodation request.

31.     Ms. Hinton was scheduled to have surgery on her feet on July 17, 2017 to remove previously implanted hardware. In preparation, Ms. Hinton requested a reasonable accommodation

-- to work from home while she recovered from surgery. On June 19, 2017, Carol Griffiths, a USDA Reasonable Accommodation Specialist, approved her accommodation request to telework as needed from home until released to return to the office. Unrelated to her surgery, Ms. Griffiths also approved Ms. Hinton's accommodation request to telework every Wednesday or to have a ten-hour, four day a week schedule in order to attend therapy and other medical appointments. Both approval letters stated that Ms. Hinton was a qualified individual with a disability and is therefore entitled to an "*effective* reasonable accommodation." (emphasis in original).

32.    Ms. Hinton's then-supervisor, Deborah Stewart, approved her request to telework for home while recovering from surgery from July 2017 until November 2017. While working from home, she was able to complete all essential functions of her job and received no written or oral complaints from Agency management.

33.    When Ms. Hinton returned to work in November 2017, she was permitted to bring RJ to work with her every day as a reasonable accommodation. RJ would sit by Ms. Hinton's desk while she worked and would walk beside her as she moved around the office to complete various tasks. The Agency placed no restrictions or conditions on her use of her service animal while she worked in the office.

34.    Following Ms. Hinton's November 2017 return to the office and pursuant to the August 2016 reasonable accommodation that allowed her to telework from home on an as-needed basis, Ms. Hinton typically performed telework from home approximately 16 to 20 days per month in order to accommodate her various medical appointments and PTSD symptom flareups. Ms. Hinton would inform her supervisor, Mr. Beckwith, by email or interoffice message when she would be teleworking due to an appointment or if she was having a PTSD flare-up and needed to go home for the day.

7

35.     In July 2018, Ms. Hinton was given a temporary duty assignment to the State Plant Health office in Austin, Texas. While stationed in Texas, Ms. Hinton was still the OM for the North Carolina State Plant Health office. She teleworked with respect to the North Carolina office during the five (5) months she worked in Texas. RJ accompanied Ms. Hinton to work every day while in Texas with no restrictions or conditions on RJ as her reasonable accommodation.

## III.     The Canine Service Agreement and Reasonable Accommodation Requests

36.     Ms. Hinton resumed her post in the North Carolina State Plant Health office on November 13, 2018. Upon return, Mr. Beckwith presented Ms. Hinton with a Canine Service Agreement (the "Agreement") dated November 26, 2018 which provided the following stipulations, among others, to her use of RJ in the office:

   i.    RJ will be on a leash at all times when accompanying you during work related activities;

  ii.    RJ will be with you at all times and if he cannot be, he will be crated or otherwise restrained while not under your direct control; and

 iii.    You agree to maintain control of RJ at all times.

37.     The Agreement also stated that after three (3) documented violations, RJ would no longer be able to accompany her to the office.

38.     Mr. Beckwith stated that if Ms. Hinton did not sign the Agreement, RJ could not come to work with her the following day. Ms. Hinton was surprised by the Agreement because her use of RJ had never been subjected to stipulations in the past. Feeling as if she had no choice, Ms. Hinton signed the Agreement.

39.     Within hours of signing, Ms. Hinton contacted her representative from the National Association of Plant Protection and Quarantine Office Support Employees (the "Union") and filed a grievance regarding the Agreement's stipulations because they were not feasible and prevented

RJ from providing her with necessary accommodations. For example, while using the copier, Ms. Hinton must use both hands, making it impossible to keep RJ's leash in her hand at all times. Additionally, if RJ was restrained inside Ms. Hinton's workstation, if she were to fall, RJ would not be able to get to her. The stipulations in the Agreement rendered Ms. Hinton's use of RJ as a reasonable accommodation ineffective.

40.     On November 28, 2018, Ms. Hinton requested to telework as a reasonable accommodation because of the shift in the office environment. Mr. Beckwith's strict enforcement of the Agreement's stipulations caused Ms. Hinton increased panic attacks and otherwise exacerbated her PTSD-related symptoms. In her request to Mr. Beckwith, Ms. Hinton stated "[s]ince it seems like you want RJ not seen by others, teleworking from home will appease all the sudden requirements you are wanting to enforce."

41.     Ms. Hinton's appeal challenging the Agreement was denied on December 4, 2018.

42.     On December 11, 2018, Mr. Beckwith denied Ms. Hinton's request to telework. He stated that "the essential duties of your position are not fully portable" and that Ms. Hinton needed to be in the office. Mr. Beckwith agreed to "explore the possibility" of expanding her cubicle to create more floor space for RJ.

43.     In February 2019, Ms. Hinton's cubicle was expanded, but Mr. Beckwith mandated that a baby gate be installed to encircle her workstation and required that the gate always remain closed if RJ was not tethered to her desk.

44.     Ms. Hinton explained to Mr. Beckwith that the baby gate presented a safety hazard and aggravated her disabilities in several ways. The baby gate had a plastic strip at the bottom that Ms. Hinton had to maneuver over every time she left her workstation. This was difficult for her because of mobility and balance issues. Also, Mr. Beckwith would come by her workstation every

9

day, multiple times a day[3] and would slam the gate closed without warning. Mr. Beckwith said the gate must be closed because Ms. Hinton was working on the computer and did not have RJ's leash in her hand. However, whenever RJ was in Ms. Hinton's workstation, he sat on his dog bed. As trained, RJ did not leave Ms. Hinton's workstation or otherwise roam the office. Ms. Hinton explained to Mr. Beckwith that slamming the gate triggered her PTSD symptoms, causing mood swings, anxiety and panic attacks. Mr. Beckwith continued to slam the gate closed with no regard to Ms. Hinton's disability.

45. Ms. Hinton and her Union Representative Julie Shepherd attempted to engage Mr. Beckwith in interactive discussions regarding the Agreement and the baby gate in order to find stipulations that would allow Ms. Hinton to utilize her reasonable accommodation in an effective way while also addressing Mr. Beckwith's concerns. Mr. Beckwith refused to amend the terms of the Agreement.

46. Ms. Shepherd also reached out to Mr. Beckwith's supervisor, Calvin Schuler and requested a meeting to discuss the situation. Mr. Shuler stated that it was a matter to be considered by Reasonable Accommodation and he would not participate in a meeting.

47. On March 6, 2019, Dr. Kirchmann wrote a letter stating that "[Ms. Hinton's] current work environment and the restrictions placed on her and her service animal are not conducive to her optimal mental health and are indeed worsening her symptoms. As part of reasonable accommodations, I would recommend telework to promote her health and functioning on the job."

48. As a result of Mr. Beckwith's continued failure to accommodate her disability and his ongoing harassment, Ms. Hinton contacted the Agency's Equal Employment Office ("EEO") counselor and made an informal complaint on March 14, 2019 as required by the Agency's EEO

---

[3] Prior to the erection of the baby gate, Mr. Beckwith visited Ms. Hinton's workstation very infrequently.

administrative procedures. Mr. Beckwith became aware of Ms. Hinton's EEO activity on March 25, 2019.

49.     On March 15, 2019, Dr. Kirchmann completed a Certification of Health Care Provider for Employee's Serious Health Condition form as required by the United States Department of Labor ("DOL") for use of available Family and Medical Leave Act ("FMLA") time. Dr. Kirchmann stated that Ms. Hinton's "hypervigilance[4] as a symptom of PTSD needs accommodation by her service animal." This request was never granted because the events described *infra*.

50.     Ms. Shepherd acted as Ms. Hinton's representative during the EEO and reasonable accommodation processes.  She made many attempts to speak with Mr. Beckwith regarding the Agreement and reasonable accommodation requests, but he refused to speak with her.

51.     On March 27, 2019, two days after he became aware of her EEO activity, Mr. Beckwith provided Ms. Hinton with a Notice of Noncompliance with the Agreement. It stated that he had received reports that she was without direct control over RJ on March 18 and March 19, 2019. He requested that she provide a written response and stated that she was "not authorized to conduct an investigation into this matter." Ms. Hinton refused to sign the Notice's Acknowledgement Receipt because the Agreement hindered her use of her Agency-approved reasonable accommodation.

52.     On March 28, 2019, Mr. Beckwith continued to harass Ms. Hinton by slamming the baby gate, which triggered her PTSD symptoms. Ms. Hinton informed Mr. Beckwith and her EEO counselor that she was utilizing her Maxiflex hours and leaving for the day. Ms. Hinton was so upset by Mr. Beckwith's actions that she called the Wounded Warrior Project, which provides,

---

[4] Hypervigilance is a common symptom of PTSD which causes a state of heightened alertness. Those experiencing hypervigilance are unusually sensitive to the environment and people around them.

among many other services, mental health support for veterans like Ms. Hinton. In order to take advantage of the mental health support service, Ms. Hinton had to call its Suicide Hotline. Ms. Hinton was not suicidal and had no intention of hurting herself or others—she just needed someone to talk to about her frustrations and anxiety.

53.     Later that afternoon, Ms. Hinton's EEO counselor called to check on her. Ms. Hinton told her that she was feeling much better after talking to someone at the Wounded Warriors Project when she called its Suicide Hotline. Ms. Hinton explained that she had not been suicidal but merely needed someone to talk to.

54.     On March 29, 2019, Mr. Beckwith informed Ms. Hinton that she was being placed on administrative leave as a result of her contact with the Wound Warrior Suicide Hotline. Mr. Beckwith stated that she could return to work on April 3, 2019 so long as she provided a doctor's note indicating that she was not a danger to herself or others.

55.     On April 1, 2019, Ms. Shepherd attempted to contact Mr. Beckwith's supervisor, Mr. Calvin Shuler to discuss the hostile working environment created by Mr. Beckwith. Mr. Shuler refused to speak with Ms. Shepherd regarding the issue. Ms. Shepherd reported her conversation with Mr. Schuler to the Agency's Associate Deputy Director of APHIS-PPQ, Matthew Royer, who only stated that proper protocol would be followed.

56.     As requested, Ms. Hinton provided Mr. Beckwith with a letter from Dr. Kirchmann, which stated "[a]t this time, [Ms. Hinton] is not felt to be a danger to herself or others. She is cleared to return to work to work her position in the office." He also stated that "[g]iven the work environment and her requirement for a service animal, telework, in whatever capacity it is available, would be optimal."

12

57.    Mr. Beckwith again informed Ms. Shepherd that telework more than one day a week was not feasible because her job was not fully portable. Ms. Shepherd informed him that persons in Ms. Hinton's OM position had teleworked from home full-time in the past and that the Agency had several OMs who managed multiple other states for a single duty location-- that the position was demonstrably fully portable.

58.    Mr. Beckwith continued to refuse Ms. Hinton's request for a reasonable accommodation.

## IV.    Formal Disciplinary Action by the Agency

59.    On April 3, 2019, nine (9) days after he learned of Ms. Hinton's EEO activity, Mr. Beckwith sent Ms. Hinton several letters informing her that he had proposed she be removed from her position and putting her on immediate notice leave. The letters included:

   i.    Notice of Proposed Removal: Mr. Beckwith issued the Notice of Proposed Removal, effective thirty (30) days from receipt thereof. The Notice alleged that Ms. Hinton lacked candor and failed to follow instructions based solely on noncompliance with the Agreement (which hindered her use of the Agency-approved reasonable accommodation); and

   ii.    Notice Leave Letter: Mr. Beckwith put Ms. Hinton on notice leave pursuant to 5 U.S.C. § 6329b(b)(1), which states that an employee may be put on notice leave if the employee is in a notice period and if the agency has made a determination that the employee may pose a threat to himself or others. In his letter, Mr. Beckwith stated that "I have determined that it is in the government's best interest that you be placed on notice leave pending the decision of the disciplinary action being proposed against you dated April [3], 2019." Mr. Beckwith "determined" that Ms.

13

Hinton was a risk to herself or others solely because she utilized available mental health resources through the Wounded Warrior Suicide Hotline. During the Notice Leave period, Ms. Hinton was not allowed to work or have contact with Agency employees.

60.     In response to Mr. Beckwith's Notice Leave letter, Dr. Kirchman provided further documentation regarding Ms. Hinton's ability to work on April 10, 2019. He stated that "[s]he is not felt to be a danger to herself or others. She was cleared to return to work at her position in the office in the April 3rd letter. She was not and is not felt to be incapacitated and is able to perform her duties." He further indicated that given the work environment and her requirement for a service animal, telework, in whatever capacity it is available, would be optimal.

61.     Mr. Beckwith sent Ms. Hinton a Stone/Ward Notice on April 12, 2019, which outlined the specific USDA Guide for Disciplinary Penalties ("Penalty Guide") he considered in proposing her removal, including:

i.      Lack of Candor: The Penalty Guide provides for a Letter of Reprimand to Removal for a first-time offense for misrepresentation, falsification or concealment of material facts or documents in connection with an official matter, including an investigation. In his letter, Mr. Beckwith states that though the misconduct described in the Penalty Guide is not the "exact type" of misconduct alleged against Ms. Hinton, he finds it "most applicable."

ii.     Failure to Follow Instructions: The Penalty Guide provides for a Letter of Reprimand to a 14-day suspension for a first-time offense of negligence, including the careless failure to comply with rules, regulations, written procedures or proper supervisory instructions. Mr. Beckwith states that despite the Penalty Guide's lesser

suggested sanction, because of her "numerous instances" of failure to follow instructions and the amount of time he has spent telling her to follow his instructions, he believes a "more severe penalty" is warranted.

62. On May 2, 2019, Ms. Hinton received a proposed Alternative Dispute Agreement which provided terms for the resolution of the April 3rd Notice of Proposed Removal. Pursuant to the proposed Alternative Dispute Agreement, the Agency would mitigate the discipline to a thirty (30) day suspension and limit the discipline "at this time" to a fourteen (14) day suspension without pay provided that (among other items):

   i.   Ms. Hinton acknowledge that she engaged in all misconduct outline in the Notice of Proposed Removal and not engage in the same misconduct for two years; and

   ii.  Upon signing the proposed Alternative Dispute Agreement, Ms. Hinton releases, waives and withdraws with prejudice any and all formal or informal complaints, grievances, EEO complaints, employment concerns, civil actions, etc. against the Agency and its employees, "**including but not limited to, any claims of employment discrimination.**"

63. Ms. Hinton notified the Agency that she would not sign the proposed Alternative Dispute Agreement on May 6, 2019.

64. On May 3, 2019, Mr. Beckwith informed Ms. Hinton that she was authorized to return to regular duty status and should report to the office on Monday, May 6, 2019. Ms. Hinton did not want to return to the office because the work environment was significantly impacting her mental health. In order to remove herself from the hostile environment at the office, Ms. Hinton requested two reasonable accommodations on May 7, 2019: 1) reassignment to another position

15

that would provide telework opportunities, and 2) full-time telework in her current position to avoid exacerbation of her disability.

65.     To avoid working in the hostile office environment while her reasonable accommodation requests for telework and/or reassignment were pending, Ms. Hinton sought twelve (12) weeks of FMLA leave. On May 9, 2019, Dr. Kirchmann completed the DOL's Certification of Health Care Provider for Employee's Serious Health Condition form in support of her request. Dr. Kirchmann indicated that Ms. Hinton suffered from an exacerbation and increase in her PTSD symptoms which was triggered by her work environment. Reasonable Accommodation Coordinator David Walton granted her FMLA leave on May 14, 2019. The effective date of Ms. Hinton's leave was May 8, 2019.[5]

66.     On May 24, 2019, the Agency issued Ms. Hinton a Letter of Decision on Proposed Removal, which resulted in a thirty (30) day suspension without pay from June 9, 2019 through July 8, 2019. The Letter of Decision stated that though Ms. Hinton had no prior discipline during her five (5) year tenure with the USDA, the seriousness her misconduct warranted the suspension.

67.     Ms. Hinton exhausted her unpaid FMLA time on September 10, 2019. After her FMLA leave, the Agency approved Ms. Hinton leave without pay until a decision was made regarding her reasonable accommodation requests.

68.     On November 7, 2019, Ms. Hinton received a Denial of Eligibility letter from Mr. Beckwith. Mr. Beckwith denied her request to telework because it would cause the Agency undue hardship and would require removal of essential functions of her job. He stated that the OM position required in-office personnel. Ms. Hinton's request for reassignment was also denied. The

---

[5] Ms. Hinton used annual leave to cover missed work on May 6 and May 7 until her FMLA request was approved.

16

Agency stated it searched for a "suitable position compatible with [Ms. Hinton's] disability related limitations" in her chosen cities from May 2019-October 2019 but were unsuccessful.

69.     Ms. Hinton requested copies of documents evidencing the Agency's reassignment search, but her request went unanswered.

70.     On January 27, 2020, Ms. Hinton received a letter from Mr. Beckwith which provided her with two options regarding her employment with the Agency:

    i.    Ms. Hinton may return to her previous full-time position on the condition that she brings a doctor's letter indicating she is able to perform the essential functions of her job per her job description without being a danger to herself or others; or

    ii.    Ms. Hinton may resign.

71.     Ms. Hinton responded through counsel on February 11, 2020 that she wanted to return to full-time work with effective reasonable accommodations in place. To date, Ms. Hinton has not received a response to her request to discuss the reasonable accommodations needed for her to return to work.

**FIRST CLAIM FOR RELIEF**
**29 U.S.C. § 791—Violations of the Rehabilitation Act**

72.     Plaintiff reiterates and realleges each and every paragraph above as if set forth fully herein.

73.     Ms. Hinton is a disabled individual for the purposes of the Rehabilitation Act. The VA categorizes her as a 90% service-connected disabled veteran. As discussed *supra*, Ms. Hinton has physical impairments to both feet and mental impairments including PTSD, Major Depressive Disorder and Generalized Anxiety Disorder. These conditions substantially limit one or more of her major life activities, including but not limited to walking, standing, interacting with others and working.

17

74.     Ms. Hinton is also a "qualified individual" for purposes of the Act. As outlined *supra*, she possesses the requisite skill, experience, education and other job-related requirements for the OM position. She held the position from February 2014 through March 2019 with outstanding performance reviews and no disciplinary action.

75.     Ms. Hinton can perform the essential functions of her position with a reasonable accommodation. While using RJ as reasonable accommodation from November 2017 through November 2018, Ms. Hinton performed her job with no complaints. Additionally, when Ms. Hinton's PTSD symptoms flared-up or she required surgery with extensive recovery, Ms. Hinton was able to perform the essential functions of her job while teleworking from home.

76.     The Agency and its employees are aware of Ms. Hinton's disability. Among other activities, Ms. Hinton has: 1) provided the Agency with documentation which shows the VA's 90% disability rating; 2) informed coworkers and supervisors of her medical conditions when requesting reasonable accommodations; and 3) utilized her service canine RJ in the office on a daily basis since November 2017. The Agency regards Ms. Hinton as having such physical and mental impairments which substantially limit one or more of her major life activities because it granted Ms. Hinton's requests to telework as a reasonable accommodation in August 2016 and from July 2017-November 2017. The Agency also approved her use of a service canine as a reasonable accommodation in November 2017.

77.     Defendant violated the Act when it intentionally discriminated against Ms. Hinton by failing to provide her with reasonable accommodations as described herein below.

### a) <u>Failure to Accommodate Service Canine</u>

78.     The Agency approved Ms. Hinton's use of RJ as a reasonable accommodation in November 2017, thereby acknowledging that Ms. Hinton is a qualified individual with a disability.

79.     Ms. Hinton successfully performed the essential functions of her position from November 2017 through November 2018 with RJ as a reasonable accommodation. She received no complaints from co-workers or management regarding RJ's behavior in the office during the year.

80.     From November 2017 to November 2018, RJ was an **effective** accommodation that addressed the job-related difficulties created by Ms. Hinton's disability and he allowed Ms. Hinton to attain an equal level of achievement, opportunity and participation in the workplace as a non-disabled individual.

81.     Defendant intentionally discriminated against Ms. Hinton by imposing the leash restriction and baby gate requirement. The leash stipulation created a potentially dangerous situation for Ms. Hinton. Because of her balance and mobility issues it is not safe for her to carry papers and other objects in her hands while also holding RJ's leash. The stipulation created a greater risk for a fall. Additionally, the Agency's requirement that RJ be tethered while in Ms. Hinton's workstation would prevent him from assisting her in the event of an emergency. For instance, it is not necessary for RJ to accompany Ms. Hinton every time she leaves her workstation. If she were to walk a few feet outside of her cubicle and fall, if tethered, RJ would not be able to reach her. RJ is a trained service animal—he will stay put unless commanded by Ms. Hinton to do otherwise. Rather than assisting Ms. Hinton with her disability, the leash stipulation creates more job-related difficulties related to her physical impairments.

82.     Similarly, the Agency's requirement that a baby gate encircle Ms. Hinton's workstation and that its gate remain closed at all times increased Ms. Hinton's PTSD symptoms, particularly her hypervigilance. Ms. Hinton told her supervisor that having the gate closed triggered her PTSD symptoms and anxiety, but Mr. Beckwith knowingly and purposefully

continued to do so. The Agency refused to engage in the interactive process regarding the Agreement with either Ms. Hinton or her Union Representative, Ms. Shepherd.

83. The Agreement's stipulations increased Ms. Hinton's job-related difficulties presented by her disability, which rendered RJ ineffective to Ms. Hinton's disability-related needs, thereby making the accommodation previously granted by the Agency completely null.

84. RJ as a reasonable accommodation posed no undue hardship on the Agency. The Agency was not required to contribute financially to RJ's upkeep. RJ did not bark or otherwise disrupt office operations. RJ did not roam the office. He either laid on his dog bed in Ms. Hinton's cubicle or walked by her side as she maneuvered around the office.

85. Defendant's imposition of the Agreement and its stipulations were tantamount to an outright refusal to accommodate Ms. Hinton's disability, and therefore, a violation of the Act.

**b) <u>Failure to Accommodate Telework Requests</u>**

86. Defendant further intentionally discriminated against Ms. Hinton by failing to grant her numerous requests to telework.

87. Ms. Hinton requested to telework full-time as a reasonable accommodation on November 28, 2018 and in March 2019 and May 2019. Ms. Hinton's requests were supported by documentation from her treating psychiatrist that stated Ms. Hinton's PTSD symptoms were exacerbated by her work environment and telework, in whatever capacity available, would be optimal.

88. The telework accommodation is clearly reasonable given that:

    i. Ms. Hinton teleworked as the OM for all of South Carolina's State Plant Health offices from February 2014 through February 2016 while working in the Raleigh office;

ii.   Ms. Hinton had teleworked from home on an as-needed basis since August 2016;

iii.  Ms. Hinton teleworked full-time from July 2017 through November 2017 and was able to fulfill the essential functions of her job;

iv.   Ms. Hinton teleworked as the OM of North Carolina's State Plant Health offices while living in Texas on temporary duty assignment from July 2018 through November 2019;

v.    Upon information and belief, the South Carolina OM has been teleworking to serve as OM for the North Carolina State Plant Health offices while Ms. Hinton has been on leave since April 2019; and

vi.   Agency OMs in other states telework full-time.

89.    If granted telework as a reasonable accommodation, Ms. Hinton would have been able to perform the essential function of her position, as she had in the past.

90.    The Agency denied Ms. Hinton's requests stating that it would cause an undue hardship on the Agency and would require removal of an essential function of her position. As outlined above, this position is without merit.

91.    As a direct and proximate result of Defendant's violations of the Act as described herein, Ms. Hinton has suffered and continues to suffer emotional distress, pain and suffering, mental anguish, loss of enjoyment of life and other non-pecuniary damages.

92.    As a further direct and proximate result of Defendant's violation of the Act as described herein, Plaintiff has suffered and continues to suffer pecuniary losses in the form of, *inter alia*, lost income, interest and benefits.

## SECOND CLAIM FOR RELIEF
## RETALIATION IN VIOLATION OF THE REHABILITATION ACT
### 42 U.S.C. § 12203(a)

93.     Plaintiff reiterates and realleges each and every paragraph above as if set forth fully herein.

94.     Ms. Hinton engaged in a protected activity when she contacted the Agency's EEO counselor on March 14, 2019 and filed an informal complaint against Mr. Beckwith. Mr. Beckwith learned of the EEO complaint on March 25, 2019.

95.     On March 27, 2019, two days after Mr. Beckwith learned that Ms. Hinton filed an EEO complaint against him, Mr. Beckwith gave her a written warning for her noncompliance with the Agreement. The warning specifically stated it was not a disciplinary action.

96.     On April 3, 2019, Mr. Beckwith took an adverse employment action against Ms. Hinton when he provided her with Notice of Proposed Removal, effective within thirty (30) days.

97.     A causal connection exists between Mr. Beckwith's Notice of Proposed Removal and Ms. Hinton's EEO activity, including but not limited to:

    i.   The adverse employment action occurred nine (9) days after Mr. Beckwith learned of Ms. Hinton's EEO activity;

    ii.  Removal of Ms. Hinton from her position was a stricter penalty then specified in the Agency's Guide for Disciplinary Penalties;

    iii. The Agency never proposed or took lesser disciplinary action against Ms. Hinton prior to proposing her removal; and

    iv.  The Agency presented Ms. Hinton with an Alternative Dispute Agreement whereby the Agency offered to resolve the Notice of Proposed Removal. The Agency agreed to mitigate the disciplinary measures to a fourteen (14)

day suspension without pay if Ms. Hinton, among other terms, agreed to waive and release any and all formal or informal EEO complaints, including claims of employment discrimination.

98.     The Agency retaliated against Ms. Hinton for commencing the administrative complaint process in violation of the Act.

99.     As a direct and proximate result of Defendant's violations of the Act as described herein, Ms. Hinton has suffered and continues to suffer emotional distress, pain and suffering, mental anguish, loss of enjoyment of life and other non-pecuniary damages.

100.     As a further direct and proximate result of Defendant's violation of the Act as described herein, Plaintiff has suffered and continues to suffer pecuniary losses in the form of, *inter alia*, lost income, interest and benefits.

## THIRD CLAIM FOR RELIEF
## HOSTILE WORK ENVIRONMENT IN VIOLATION OF THE REHABILITATION ACT

101.     Plaintiff reiterates and realleges each and every paragraph above as if set forth fully herein.

102.     From November 2018 until Ms. Hinton was placed on leave in April 2019, she was subjected to direct and continual harassment by Mr. Beckwith. Mr. Beckwith knowingly and intentionally exacerbated Ms. Hinton's PTSD symptoms by coming by her workstation multiple times per day and slamming the baby gate closed. Mr. Beckwith created increased job-related difficulties by requiring that she hold RJ's leash at all times or tether him to her desk. Mr. Beckwith enlisted other office employees to spy on Ms. Hinton and report to him any time the baby gate was open so that he could come by her workstation and close it.

103.     Such conduct was unwelcomed and created an offensive, intimidating and hostile work environment for Ms. Hinton and was sufficiently severe and pervasive as to alter the terms and conditions of Ms. Hinton's employment and created an abusive work environment. Ms. Hinton's treating psychiatrist, Dr. Kirchmann, provided medical documentation stating that the work environment was exacerbating her PTSD.

104.     The Agency's supervisory staff knew of the harassment that Ms. Hinton was subjected to, but took no corrective action or remedial action, and ratified and participated in the harassment.

105.     As a result of the harassment, Ms. Hinton had panic attacks which caused her to miss work, resulting in loss of vacation leave, sick leave and other types of leave.

106.     As a direct and proximate result of Defendant's wrongful discriminatory acts, Plaintiff has suffered and continues to suffer pecuniary losses in the form of, *inter alia*, lost income, interest and benefits.

107.     As a further direct and proximate result of the wrongful discriminatory acts and practices of the Agency described herein, Ms. Hinton has suffered and continues to suffer economic loss, loss of personal dignity and self-esteem, emotional distress, pain and suffering, mental anguish, loss of enjoyment of life and other non-pecuniary damages.

## JURY DEMAND

Plaintiff demands a trial by jury of the claim asserted in this Complaint.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays the Court for judgement against Defendant to the full extent permitted by 29 U.S.C. § 794a(a)(1), 42 U.S.C. § 2000e-5(f)-(k) and 42 U.S.C. § 1981a, including but not limited to, the following:

24

1.      Judgment in Plaintiff's favor, determining that Defendant's actions and conduct relating to Plaintiff violated the Rehabilitation Act.

2.      Issuance of a mandatory injunction requiring Defendant to reinstate Plaintiff and to place her in a position of equal duties, responsibilities and pay in another department of the Agency and that will reasonably accommodate Plaintiff's disabilities and that will offer her reasonable career advancement opportunities.

3.      In the alternative, award Plaintiff front pay for lost pay and benefits that Plaintiff would have acquired but for Defendant's wrongful and discriminatory actions against Plaintiff.

4.      Declare that all adverse employment actions taken against Plaintiff since March 14, 2019 were issued in unlawful retaliation against Plaintiff and in violation of the laws and regulations protecting Plaintiff as a disabled person.

5.      Order the Agency to set aside all adverse employment actions taken against Plaintiff since March 14, 2019 and to expunge all records and documents related to the adverse measures and adverse employment actions taken by Defendant against Plaintiff from its Agency personnel files, EOPF personnel files, National Personnel Records Center (NPRC), and all other Agency and government files.

6.      Award Plaintiff back pay of all monetary damages incurred, including but not limited to lost salary, interest and benefits.

7.      Award Plaintiff damages for mental anguish, emotional distress, pain and suffering, loss of enjoyment of life, inconvenience, increased medical bills and other non-pecuniary damages Plaintiff suffered as a result of the intentional unlawful actions and conduct of Defendant under the Rehabilitation Act in an amount to be determined at trial.

8. Award Plaintiff the costs, disbursements, expenses, reasonable attorneys' fees and expert witness fees incurred by Plaintiff in filing and prosecuting this action pursuant to 42 U.S.C. § 1981a and as may be authorized by any other applicable federal laws;

9. For an award of pre- and post-judgment interest to Plaintiff on all damages; and

10. For all other, further relief as this Court deems just and appropriate.

This the 20th day of February, 2020.

Respectfully submitted,

_/s/ Lindsey A. Bullard___
Lindsey A. Bullard
N.C. Bar No. 46664
Dawn T. Mistretta
N.C. Bar No. 31691
STRAUCH GREEN & MISTRETTA, P.C.
911 Paverstone Drive, Suite F
Raleigh, NC 27615
Telephone:     (919) 278-7453
Facsimile:      (855) 876-8893
dmistretta@sgandm.com
lbullard@sgandm.com
*Counsel for Plaintiff*

26